Filed 1/10/23  Marriage of Flynn CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of DENNIS L. and SHERI N. FLYNN. | |
| DENNIS L. FLYNN, Respondent, v. SHERI N. FLYNN, Appellant. | G059927 (Super. Ct. No. 14D006727) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Nancy Wieben Stock, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed in part as modified and remanded with instructions.

Law Offices of Lisa R. McCall, Lisa R. McCall and Erica Baca for Appellant.

Law Offices of Steven E. Briggs and Steven E. Briggs for Respondent.

## INTRODUCTION

Sheri Flynn appeals from a judgment entered on December 21, 2020, ending her marriage to respondent Dennis Flynn and making certain orders regarding attorney fees, spousal support, and disposition of community property. The case was tried in two phases over 10 days in 2019 and 2020 to a private judge.

Sheri disputes the court's spousal and attorney fee awards, arguing that they are insufficient. She also faults the court for accepting inadmissible evidence about certain disbursements of community property funds and, as a result, for failing to penalize Dennis for a breach of his fiduciary duty. Finally she contends that Dennis received a "double-dip" by receiving credit for paying a community debt and getting a write-off for the same debt.

We affirm the judgment in all respects except one. The family court made an erroneous assumption that adversely affected its resolution of the double-dip issue. We return the matter to the family court to correct the marital balance sheet and/or the value assigned to Dennis' business. We review the remaining issues for abuse of discretion, and we cannot find that the court abused its discretion in its rulings.

## FACTS

We recite only the facts that are pertinent to the issues Sheri has raised in her appeal.

Sheri and Dennis separated in August 2014, after a marriage of nearly 33 years. The couple had three children, who were adults at the time of trial.

Dennis is an architect with his own sole proprietor business, Dennis Flynn Architects, Inc. (DFA). At the conclusion of trial, the court valued the business at $267,140 and awarded it to Dennis.

Sheri was a full-time housewife during most of the marriage. Although she was licensed as a medical technologist, she was primarily responsible during the marriage for child-rearing. In 2013, she took a job as a cashier at a nursery/hardware store. She

2

was temporarily disabled, and her disability benefits had run out as of the second phase of trial.

At Christmas in 2007, Dennis "surprised" the family by presenting it with a motorhome.[1] The motorhome was sold in November 2014, after separation, at a loss. To make up the shortfall, Dennis borrowed a little over $35,000 from DFA, giving his personal promissory note. He used this money to pay off the debt to the lender, and he received an *Epstein* credit on the marital balance sheet for this payment.[2] The amount he still owed as of December 2014 was reflected on the company valuation schedule for 2014 a "loan to shareholder."

Dennis conducted his business from an office on Euclid Street in Fullerton. The couple owned this commercial property through a limited liability company. Dennis was the managing partner of the LLC. The property was sold in 2009 for $448,643. Dennis did not disclose the full amount of the sale proceeds to Sheri until March 2017, during the litigation regarding the divorce. The court concluded that his failure to disclose the full amount of the proceeds constituted a violation of his fiduciary duty of transparency under Family Code sections 721 and 1101.[3] The court also concluded Dennis had used the undisclosed funds to pay community obligations.

At the beginning of trial, Sheri asked for a contribution from Dennis in the amount of $175,000 for her attorney fees. The court awarded $100,000. Sheri disputes this amount as insufficient. The court also awarded Sheri $7,500 per month in permanent spousal support. On appeal, Sheri asserts that the court did not consider all the factors of

---

[1] The surprise apparently was not well received. Not only had he not consulted Sheri about this large purchase, Dennis had failed to sound out the children as to whether they would be interested in RV vacations. As it turned out, "he mis-judged the level of resistance from family members for this type of vacation."

[2] *In re Marriage of Epstein* (1979) 24 Cal.3d 76 (*Epstein*), superseded by statute on other grounds. A spouse who after separation uses separate funds to pay community obligations should be reimbursed out of community property upon dissolution. (*Id.* at p. 84.)

[3] All further statutory references are to the Family Code unless otherwise indicated.

section 4320 and the amount was also insufficient. She also asserts the court erred in refusing to award temporary spousal support retroactively.

The trial was conducted in two phases before a private temporary judge at JAMS. The first phase took place between April and June 2019. The court issued a statement of decision after the first phase, with some issues reserved for the second phase. The second phase took place in August and September 2020. The court issued a final statement of decision after this phase and corrected a few calculation errors made in the first statement of decision.

As they pertain to the issues Sheri raised on appeal, in addition to the attorney fee and spousal support awards mentioned above, the court ruled that the "loan to shareholder," which was written off, was *not* the promissory note Dennis used to pay off the balance of the motorhome debt. He was therefore entitled to an *Epstein* credit for using his separate funds to pay a community debt. In addition, although Dennis had breached his fiduciary duty by failing to disclose the entire amount of the proceeds from the sale of the Fullerton property to Sheri, he had adequately explained what he had done with the undisclosed portion of the funds: he had paid community obligations with the money. Accordingly the court refused to award Sheri 50 percent of the undisclosed amount as a penalty for breach of fiduciary duty under section 1101, subdivision (g). The court reasoned that the cases awarding this penalty all involved spouses who had spent the money on themselves or frittered it away, not spouses who had used the money to pay community expenses.

**DISCUSSION**

**I.**      *Epstein* **Credit/Value of DFA**

Sheri contends that Dennis received a double-dip with respect to the money used to pay off the motorhome. On the one hand, she says, Dennis' promissory note was subtracted from DFA's net tangible assets, thereby decreasing the company's value. On

4

the other hand, Dennis received an *Epstein* credit for paying off the loan. So he got the benefit of both the decrease in value for DFA *and* the credit.

There was considerable confusion about this issue at trial, and the briefing on appeal is not much help.

The dispute began with Dennis' purchase of a motorhome that apparently did not have the intended family bonding effect. Dennis bought it in 2007 for $196,000. He sold it, after separation, in November 2014 at a loss. To pay the difference to the lender, Dennis borrowed $35,365.40 from DFA on November 20, 2014, signing a promissory note in that amount at 2.5 percent interest.[4] The note included a payment schedule; the first payment was due on December 19, 2014. After this first payment, the balance owing was $34,427.68. Dennis testified that he paid principal and interest for some years, after which the loan was converted to interest only. He acknowledged that he still had a balance on the note as of June 2019, the first phase of trial.

Fast forward to 2019 and the parties' two forensic accounting experts' valuation of DFA as community property. The experts submitted two valuations, one for the year ending December 2014, the date closest to separation, and the other for the year ending December 2018, the date closest to the first phase of trial.

Dennis' expert listed a loan to shareholder of $34,428 as a DFA asset as of December 31, 2014.[5] He testified during the first trial phase that he *subtracted* this asset from the company's value – i.e., recorded it as a negative number – because it was a community debt. Customarily, he said, in family law matters, community debts are canceled out of a company's valuation because these debts are usually written off. Dennis' expert also testified that the source of the $34,428 loan to shareholder was the payoff of the motorhome debt. He removed it from the valuation of the business because

---

[4] The payment schedule states that the date of the loan is November 20, 20*19*. We assume the year is in error.

[5] Sheri's expert listed the same amount on his 2014 valuation of DFA.

it was a community obligation, and the community would have an offsetting liability to the company. On cross-examination, he reiterated his reason for subtracting the $34,428 loan to shareholder: "There's no reason to confuse everyone with that number because it's not going to be paid back."

During phase one of the trial, the court adopted the reasoning of Dennis' expert for eliminating the loan from the business.[6] The court found that the motorhome loan was a community debt and stated, "Had [Dennis] paid the money to himself and then paid the debt, he would have received an *Epstein* credit, resulting in the same calculation on the Marital Balance Sheet. This treatment skips a step, with no prejudice to either party." The court agreed that Dennis would get an *Epstein* credit *or* a cancellation of the debt, but not both.

The experts also valued DFA as of December 31, 2018, the date closest to phase one of the trial. By this time, the loan to shareholder category on the valuation of Sheri's expert had increased to $69,734.[7] During the first phase, Dennis' expert testified that this same amount of loan to shareholder in 2018, $69,734, which he recorded as a negative number, indicated additional borrowing after separation, but it included the $34,428 from December 2014. In the second phase, however, Dennis' expert changed the 2018 value of the loan to shareholder category. For phase two, he recorded the loan to shareholder category as negative $34,662, consisting of the 2014 loan of $34,428 and a small balance left over from 2013.

---

[6] The amount of the adjustment in the first statement of decision was given as $36,446. The source of this number is not clear.

[7] Sheri's expert listed loan to shareholder on one page of his DFA valuation as of the end of December 2018 as $69,734. On the next page, the "adjusted" total was $69,405. This second schedule included a note: "This loan was taken out after separation by [Dennis]. We have therefore left the asset asset less the amount that existed as of the date of [*sic*]" The difference between the two amounts, $329, is the same as the amount of the loan to shareholder that existed as of December 31, 2013, before separation.

The cause of the increase in the loan to shareholder category between the beginning of 2015 and the end of 2018 was not explained at trial.[8] Moreover, although Sheri's expert showed a decrease in the loan balance in 2015 and 2016, before a sizeable increase in 2017, there was no testimony about the amount of repayment of the 2014 loan.[9]

The issue boils down to whether the ultimate valuation of DFA included the 2014 loan to shareholder as an asset, that is, as a positive number. If it included the loan, then the value of DFA on Dennis' side of the ledger was increased, and he was entitled to an offsetting *Epstein* credit for using his separate property to pay off a community debt. If the asset was not included, then DFA had a lower value, beneficial to Dennis, and he would not get an *Epstein* credit because, in essence, there was no debt to pay off.

It seems clear to us that the 2014 loan-to-shareholder category included the motorhome debt. The amount, $34,428, is exactly the balance on the 2014 note that Dennis had signed the previous month to obtain the funds to pay the lender. In keeping with his practice as explained in his testimony during the first phase of trial, Dennis' expert *subtracted* this amount from his calculation of net tangible assets for the year ending December 31, 2014. This exhibit also showed a subtraction of $69,734 in net tangible assets for loan to shareholder as of the year ending December 31, 2018. This figure represented further borrowing from DFA between 2015 and 2018.

After learning that the court intended to value DFA as of the end of 2018, Dennis' expert produced another exhibit, which he called an addendum. The calculation of net tangible assets for 2014 was unchanged. For 2018, however, the amount for loan

---

[8] Sheri asserted in her declaration for attorney fees that Dennis was using DFA as his "personal piggy bank" to pay for divorce lawyers and accountants. If that is so, then the additional borrowings would not be community debts.

[9] A schedule from Sheri's expert showed a decrease in the loan balance from $34,428 at the end of 2014 to $22,019 at the end of 2015. The loan balance had decreased to $16,201 by the end of 2016. According to the payment schedule of the 2014 promissory note, the balance at the end of 2015 was supposed to be $22,019. By the end of 2016, the balance was supposed to be $9,264.

7

to shareholder as a net tangible asset changed from a negative $69,734 to a negative $34,662. This figure was broken out to $34,428 (the amount of the motorhome loan balance in 2014) and $234. This had the effect of lowering the negative value for net tangible assets and therefore increasing DFA's overall value from the first estimate.

The balance of the loan to shareholder asset left in DFA as a positive number as of 2018 is $35,072.[10] To put it another way, this amount was *not* subtracted from net tangible assets as a community debt paid off by the community, unlike the motorhome loan.

Sheri's expert calculated the loan to shareholder category as of 2018 at $69,734, the same number that Dennis's expert used. He adjusted it to remove $329, which appears to be the balance of a loan to shareholder from 2013, before separation. The resulting amount is $69,405. The difference between this amount and the $35,072 that represents the 2018 balance of the loan to shareholder is $34,333. This is the amount that Sheri sought to have added to DFA's net tangible assets as the motorhome loan.

The court refused to make this adjustment because it deemed Sheri's assumption – that the motorhome loan had been excluded (subtracted) as a DFA asset – incorrect. It stated the motorhome debt had been "picked up in subsequent years," that is, in years after 2014. The source of this error seems to have been Dennis' expert, who testified during the second phase that the motorhome was sold in 2015. The court awarded Dennis an *Epstein* credit of $35,365, the full amount of the promissory note, for paying this debt.

The motorhome was unquestionably sold in 2014 and the debt was incurred in that year. The loan to shareholder amount on both experts' schedules for the end of 2014 is $34,428, which is also the exact amount of the balance on the promissory note as of December 31, 2014. This same amount was written off on Dennis' expert's schedule

---

[10] $69,734 (unadjusted loan to shareholder as of 2018) – $34,662 (total of loans to shareholder removed from net tangible assets in 2018) = $35,072.

8

for 2018, thereby canceling the debt. So Dennis received an *Epstein* credit for paying a debt that was substantially canceled.

We are not going to get involved in fixing this. There are too many moving parts, and the calculations involved are far beyond what we could perform. In addition, we have found nothing in the record to account for how much Dennis paid on the loan, for which he might be eligible for an *Epstein* credit, compared to how much was written off, for which he would get no credit. One expert's schedule suggested that the loan was at least partly paid off in 2015 and 2016, but the amount showing on the schedule for 2018 was the full amount of the loan balance in 2014, as if no payments had been made.

Accordingly we are returning this portion of the judgment to the family court to make the necessary calculations and adjustments, based on our conclusion that the $34,428 written off of DFA's 2018 net tangible assets was the motorhome loan debt. Or the parties can agree between themselves and stop spending money on attorneys, accountants, and private judges.

## II.        **Breach of Fiduciary Duty**

Sheri makes two arguments with respect to the court's finding that Dennis had breached the fiduciary duty of disclosure. First, she says she is entitled to 50 percent of the amount from the sale of the Fullerton property that Dennis failed to disclose to her, under section 1101, subdivision (g), because the evidence of where this money went was insufficient. Second, the same code section entitles her to attorney fees, which the court failed to award.

Section 721, subdivision (b), imposes a fiduciary duty on spouses to act in the "highest good faith and fair dealing" in their transactions with each other. The fiduciary duty set out in section 721 includes "[r]endering upon request, true and full information of all things affecting any transaction that concerns the community property." (§ 721, subd. (b)(2).) Section 1100, subdivision (e) provides, "Each spouse shall act with respect to the other spouse in the management and control of the

9

community assets and liabilities in accordance with the general rules governing fiduciary relationships which control the actions of persons having relationships of personal confidence as specified in Section 721, until such time as the assets and liabilities have been divided by the parties or by a court. This duty includes the obligation to make full disclosure to the other spouse of all material facts and information regarding the existence, characterization, and valuation of all assets in which the community has or may have an interest and debts for which the community is or may be liable, and to provide equal access to all information, records, and books that pertain to the value and character of those assets and debts, upon request."

Section 1101, subdivision (a), provides, "A spouse has a claim against the other spouse for any breach of the fiduciary duty that results in impairment to the claimant spouse's present undivided one-half interest in the community estate, including, but not limited to, a single transaction or a pattern or series of transactions, which transaction or transactions have caused or will cause a detrimental impact to the claimant spouse's undivided one-half interest in the community estate." Section 1101, subdivision (g), provides that "[r]emedies for breach of the fiduciary duty by one spouse, including those set out in Sections 721 and 1100, shall include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs."

In this case, the court found that Dennis had violated his fiduciary duty with respect to the sale of the real property "in not promptly providing the information tracking the expenditures of the sale proceeds." It did not, however, award Sheri 50 percent of the undisclosed amount, reasoning that Sheri had not shown any "impairment" to or detrimental impact on the community resulting from the non-disclosure; Dennis showed he had used all the money from the sale to benefit the community.

Sheri does not dispute the court's reasoning that the remedy of section 1101, subdivision (g), requires impairment of a community asset. Instead, she contends

10

that the court's finding of no impairment rested on insufficient evidence, specifically on Quickbooks printouts and check registers of several different accounts, including Dennis' personal checking accounts, instead of individual source documents such as invoices, checks, and bank statements. She contends that the printouts and registers do not qualify as business records under Evidence Code section 1271 because they were not trustworthy and because a record of Dennis's personal checking accounts was not a business record.[11] They also do not qualify under Evidence Code section 1552 because they were not "computer-generated."[12]

"The trial court has wide discretion to determine whether there is a sufficient foundation to qualify evidence as a business record; [a reviewing court] will overturn its decision to admit such records only upon a clear showing of abuse." (*Conservatorship of S.A.* (2018) 25 Cal.App.5th 438, 447.)

DFA's office manager/bookkeeper, Veronica Keohane, testified at length about the evidence supporting the disbursement of the proceeds from the sale of the Fullerton property. She had held her position at DFA for 14 years as of 2020 and had used Quickbooks the entire time. Her duties included billing, receivables, payroll, and invoice processing. She was solely responsible for entries into Quickbooks. She also did all of the accounting for the limited liability company that owned the Fullerton property,

---

[11] Evidence Code section 1271 provides, "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

[12] Evidence Code section 1552, subdivision (a), provides, "A printed representation of computer information or a computer program is presumed to be an accurate representation of the computer information or computer program that it purports to represent. This presumption is a presumption affecting the burden of producing evidence. If a party to an action introduces evidence that a printed representation of computer information or computer program is inaccurate or unreliable, the party introducing the printed representation into evidence has the burden of proving, by a preponderance of evidence, that the printed representation is an accurate representation of the existence and content of the computer information or computer program that it purports to represent."

11

and she oversaw deposits and disbursements from some of Dennis' personal checking accounts at different banks.

Keohane testified that she would enter an invoice into the Quickbooks system within a day of receiving it. Checks issued from the account would be entered into the system on the day of issuance. She followed the same procedures for Dennis' personal checking accounts.

Sheri objected to the evidence on the ground that the Quickbook printouts were hearsay and worthless without the source documents. She argued, "[I]n order for the schedule to be admitted, each and every line of that schedule would need to be independently corroborated by evidence that is admitted before the court."

The court ruled the exhibits satisfied the requirements of the business records exception to the hearsay rule; "[t]he key is whether there are reliable features associated with the preparation of the record, including whether it's done regularly, whether it's at or near the time of the act or event, how it's been prepared and other indicia of reliability." The court also ruled that Sheri had not overcome the presumption of Evidence Code 1552, and therefore the computer printouts were admissible.

Sheri's argument that the registers from Dennis' personal checking accounts were not business records in this case is incorrect. Evidence Code section 1271 does not include a requirement about where the records are kept. A business record entry must be made in the regular course of a business, it must be made at or near the time of the event, and a qualified witness must testify as to its mode of preparation. Keohane's testimony provided all this information.

The "business" was the limited liability company that owned the Fullerton property. The issue was where the proceeds from the sale of the business' property went. Keohane traced the proceeds through several accounts, including Dennis' personal checking accounts, to their ultimate destinations. Because Dennis had a fiduciary responsibility to account for it, this money did not become his personal money regardless

12

of where it was deposited. The check registers were business records created in the regular course of a business to the extent that they recorded deposits and disbursements of company money, even if some of the registers also recorded private disbursements for gas and groceries.

Sheri's other argument is that the Quickbooks printouts were not "trustworthy" because the underlying source documents were not included. At trial, her counsel argued that "[t]hose documents are, in fact, bank statements, checks, invoices, things of that nature which would have to be independently admitted into evidence through the proper foundation for the exhibit [i.e., the Quickbooks printouts] to be able to stand on its own."[13] Counsel apparently failed to recognize that bank statements, checks, and invoices are themselves hearsay. To avoid a hearsay objection, every enterprise that sent an invoice would have to send a representative, one with personal knowledge of the transaction, to testify as to the amount the enterprise charged for goods or services provided to the limited liability company. Dennis would have to go through every check he wrote and testify that this was the amount he dispatched to the payee. The business records exception was created to make such an extravagant waste of time unnecessary. (See *People v. Crosslin* (1967) 251 Cal.App.2d 968, 975 ["The object of the statute is, of course, to eliminate the necessity of calling each witness and to substitute the record of the transaction instead."])

The court did not abuse its discretion in admitting the Quickbooks printouts and the check registers. There is no question that the first three conditions for admission under Evidence Code section 1271 were met. The court's decision that the records were trustworthy was also well within its discretion.

---

[13] At one point during trial, Sheri's counsel argued that the banks' custodians of records would be the proper people to lay a foundation for the documents. The banks' custodians of records could state only that the statements accurately recorded money coming in or going out. They could not testify on personal knowledge as to where the money came from and where it went, the issue before the court.

Evidence Code section 1552 creates a presumption affecting the burden of producing evidence that the printed representation of computer information is presumed to be an accurate representation of that information in the computer itself. "The burden of producing evidence as to a particular fact is initially on the party having the burden of proof as to that fact. [Citations.] Once the plaintiff presents evidence to establish each element of its case, the defendant has the burden of going forward with its own evidence as to those issues. [Citations.] Where the opposing party produces evidence undermining the presumption, the presumption is disregarded and the trier of fact must decide the question without regard to it. . . . [¶] Evidence Code sections 1552 and 1553 provide a presumption for both the existence and content of computer information and digital images that the printed versions purport to represent, and establish, preliminarily, that a computer's print function has worked properly." (*People v. Rekte* (2015) 232 Cal.App.4th 1237, 1245.)

"It is settled computer systems that automatically record data in real time, especially on government-maintained computers, are presumed to be accurate. Thus, a witness with the general knowledge of an automated system may testify to his or her use of the system and that he or she has downloaded the computer information to produce the recording. No elaborate showing of the accuracy of the recorded data is required. Courts in California have not required 'testimony regarding the "'acceptability, accuracy, maintenance, and reliability of . . . computer hardware and software'" in similar situations. [Citations.] [¶] The rationale is that while mistakes may occur, such matters may be developed on cross-examination and should not affect the admissibility of the printout or recording of the data itself. [Citations.]" (*People v. Dawkins* (2014) 230 Cal.App.4th 991, 1003.)

In this case, the Evidence Code section establishes a presumption that the printouts Keohane testified to were accurate representations of what was in the Quickbooks system. Sheri failed to produce evidence to rebut that presumption, that is,

14

evidence that the information in the system was *not* the same as the printed documents. The court was therefore correct in overruling this objection.

*People v. Hawkins* (2002) 98 Cal.App.4th 1428 (*Hawkins*), on which Sheri relies, deals with a different situation. In that case, a trade secrets case, the issue was whether the computer accurately recorded the date and time when certain internal files were accessed. (*Id.* at p. 1446.) The trial court held that the computer records were admissible based on an offer of proof that the computer's clock was functioning properly. The reviewing court held that the records were properly admitted. (*Id.* at p. 1450.)

The Quickbooks printouts were admissible under Evidence Code section 1552 because Sheri failed to rebut the presumption that they accurately reflected what was in the system. "This presumption operates to establish only that a computer's print function has worked properly." (*Hawkins, supra,* 98 Cal.App.4th at p. 1450.) Then Keohane testified to the preparation of the information the printouts contained, establishing the business records exception to the hearsay rule for the information.[14] These records were properly admitted at trial.

As to attorney fees under section 1101, subdivision (g), an award is, by reason of the statutory language, mandatory. (*In re Marriage of Fossum* (2011) 192 Cal.App.4th 336, 348; *In re Marriage of Hokanson* (1998) 68 Cal.App.4th 987, 993.) The code section, however, does not require a separate award.

In this case, the court folded attorney fees for violation of Dennis' fiduciary duty to disclose into the general discussion of attorney fees. It is clear from the discussion of attorney fees in the second statement of decision that the court was factoring the breach of fiduciary duty into its decision.

---

[14] In *Hawkins*, there was no second step, because the only issue was whether the "computer-generated" information, i.e., the date and time stamps, was accurate. (*Hawkins, supra,* 98 Cal.App.4th at pp. 1449-1450.) There was no issue regarding the admissibility of "computer-stored" information, i.e., data input by a person.

Sheri does not point us to any document or testimony in which she broke out the fees specifically attributable to Dennis' failure to disclose. Under these circumstances, we do not believe the court abused its discretion in making a global award of attorney fees, one clearly focused on Dennis' breach as well as the other factors pertinent to a fee award.

**III.          Attorney Fees**

Section 2030, subdivision (a)(2), provides in pertinent part: "When a request for attorney's fees and costs is made, the court shall make findings on whether an award of attorney's fees and costs under this section is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties. If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs."

Sheri initially sought a contribution from Dennis of $175,000 for her attorney fees. Dennis had previously paid $5,400 toward Sheri's fees. She had also received a $10,000 distribution from community funds to pay attorneys in March 2014. During phase two, she testified about additional fees in incurred between phase one and phase two, in part because she had changed lawyers between the two phases.

The court noted a "disparity in income-earning capacity" between Dennis and Sheri, especially as both were now in their 60s. The court also noted that the money for fees would come from the proceeds of the sale of the family home, then in trust, so Dennis would not have to pay immediately out of his own pocket and was "in the superior position to obtain earnings and wealth to make it up."

The court's decision finally rested on the reasonableness of Sheri's request, "in light of all the circumstances of the case, including the parties' litigation conduct." As the court stated, "No one party can claim an ultimate victory. Sheri accused Dennis of fiduciary duty violations when he bought a family motor home and took out student loans for college educations. Dennis sought portions of a personal injury settlement fund,

16

which was received decades earlier, for which there was little notice to Sheri (the injured party) that these would be treated as anything other than her recovery. Both parties sought full trial treatment of a discrepancy in the value of [DFA], which was unlikely to yield more than a $16,000 difference.[15] This issue prevented the trial from being completed on a timely basis and resulted in two forensic CPAs, two lawyers and a private judge taking up significant time on the issue." The court also referred to Dennis' withholding of the information regarding the sale of the commercial property: "Dennis' initial failure to provide reconciling documentation on the handling of the Euclid Street sales proceeds pervaded almost the entire 4-year period of separation. It prevented the case from settling by fostering continued acrimony over what Sheri telegraphed was a key issue to her. Ultimately, the documents necessary to satisfactorily explain the flow of funds were simple and easily obtained." Finally the court noted that Sheri had liquid assets "from the division of community property and existing separate property cash and investments." Her fees were paid up, whereas Dennis had to borrow to pay trial costs and still owed his lawyers $43,000.

We review an award of attorney fees under section 2030 for abuse of discretion. (*In re Marriage of Pearson* (2018) 21 Cal.App.5th 218, 234-235.) That discretion includes evaluating productivity and counter-productivity in litigation. (*Karton v. Ari Design & Construction, Inc.* (2021) 61 Cal.App.5th 734, 746.) The court "may consider a number of factors, including the nature and complexity of the litigation, the efforts of the parties to resolve as many areas of disagreement as possible without judicial intervention, and its own experience in determining the reasonable value of the services rendered." (*In re Marriage of Pearson, supra,* 21 Cal.App.5th at p. 234.) It also considers trial tactics and litigation conduct. (See *In re Marriage of Nakamoto & Hsu* (2022) 79 Cal.App.5th 457, 469.) "Financial resources are only one factor for the court

---

[15]    This reference appears to be to the double dip/*Epstein* issue.

to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances."  (§ 2032, subd. (b).)

Sheri contends that the court abused its discretion by awarding her $100,000 in fees.[16]  She naturally focuses on the court's criticisms of Dennis' conduct while ignoring her own positions.  She also does not mention her separate cash and investments as sources of payment for her lawyers.

In this case, the court discussed at length the factors it considered when it made its fee award, including Dennis' breach of fiduciary duty.  It considered the disparity between the earning power of each spouse.  It considered the resources available to each spouse.  It gave substantial weight to the litigation conduct of each spouse – Sheri as well as Dennis – and concluded that each of them had prolonged the litigation through taking and sticking to unreasonable or petty positions.

Sheri argues that the court showed its "hurried approach" to the attorney fee issue by not receiving the billing statements from her counsel.  This grossly misrepresents the record.  On the next to last day of trial in 2020, Sheri was asked to authenticate exhibit No. 61, her declaration from 2019 regarding her attorney fees. The court admitted both her declaration and exhibit No. 62, the declaration filed by a former attorney regarding her request for fees, also prepared in 2019.  This latter declaration was the source of the $175,000 figure used by the court as Sheri's request.  The attorney's declaration also attached three pages of bills.

Sheri's counsel then tried to get exhibit No. 57 admitted, which he characterized as "essentially the back-up to the attorney fee declaration – back-up to

---

[16]     Sheri's counsel's declaration, filed in connection with phase one of the trial, asked for 50 percent of $349,921 or $174,996.  This is the amount the court used when it calculated attorney fees. The total of attorney fees to which she testified at trial amounts to under $400,000, $120,000 of which was disputed.  On appeal, Sheri contends that her fees and costs amounted to $482,300 by the end of phase two.

Ken her objections to the tentative and final statements of decision from phase two, Sheri did not tell the court that it had relied on an incorrect amount of attorney fees or direct the court to evidence of additional fees. She objected only that the court had not allocated fees between those for breach of fiduciary duty and those based on need, and she asked only for the legal and factual basis of the award, which the court had already given.

18

[exhibit] 62 is exhibit 57, which are the billing statements, records from prior counsel." The court declined to admit exhibit No. 57 because it already had billing records attached to declarations, and the fees had been "fully documented." Counsel then questioned Sheri regarding the amounts she had paid to each of her previous six law firms and also regarding the amount she owed his firm. There is no evidence of "hurry" or carelessness on the court's part in these pages from the transcript, only a desire not to add duplicate pages to an already significant pile of paper.

Sheri now contends that it is this testimony – not her prior counsel's declaration – and a subsequent declaration by her newest counsel that she had paid an additional $44,000 that the court should have used to determine the total amount of fees she had incurred. She did not, however, inform the court of her contention it had relied on incorrect evidence or an incorrect declaration when it determined the amount of attorney fees, although she objected to the fee award in both the tentative and final statements of decision on other grounds.

It appears to us the court carefully weighed the relevant factors when it arrived at its decision. We cannot find the court abused its discretion in awarding Sheri $100,000 in fees.

## IV. Spousal Support

Sheri makes two arguments with respect to spousal support. First, the permanent support order of $7,500 per month was insufficient. Second, the court incorrectly decided she was not entitled to temporary spousal support for the period between May 16, 2018, and July 31, 2019.

19

### A. Permanent Support

With respect to the permanent spousal support award, Sheri states that the court must consider and weigh all the factors of section 4320.[17] This is true, and the court discussed the statutory factors in detail in the statement of decision it issued after phase one of the trial. It listed Sheri's current assets, including an inheritance of more than a half million dollars and a mortgage-free house. The court also calculated what she could expect from investment income.

We review an award of spousal support for abuse of discretion. (*In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1572). "[W]e do not substitute our judgment for that of the trial court, and we will disturb the trial court's decision only if no judge could have reasonably made the challenged decision." (*In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1046-1047.)

In her opening brief, Sheri did not point to any factor or factors that the family court failed to consider or weighed incorrectly. She simply complained that the

---

[17] Section 4320 provides in pertinent part, "In ordering spousal support under this part, the court shall consider all of the following circumstances: [¶] (a) The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage, taking into account all of the following: [¶] (1) The marketable skills of the supported party; the job market for those skills; the time and expenses required for the supported party to acquire the appropriate education or training to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment. [¶] (2) The extent to which the supported party's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported party to devote time to domestic duties. [¶] (b) The extent to which the supported party contributed to the attainment of an education, training, a career position, or a license by the supporting party. [¶] (c) The ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living. [¶] (d) The needs of each party based on the standard of living established during the marriage. [¶] (e) The obligations and assets, including the separate property, of each party. [¶] (f) The duration of the marriage. [¶] (g) The ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party. [¶] (h) The age and health of the parties. [¶] . . . [¶] (j) The immediate and specific tax consequences to each party. [¶] (k) The balance of the hardships to each party. [¶] (l) The goal that the supported party shall be self-supporting within a reasonable period of time. Except in the case of a marriage of long duration as described in Section 4336, a 'reasonable period of time' for purposes of this section generally shall be one-half the length of the marriage. However, nothing in this section is intended to limit the court's discretion to order support for a greater or lesser length of time, based on any of the other factors listed in this section, Section 4336, and the circumstances of the parties. [¶] (m) The criminal conviction of an abusive spouse shall be considered in making a reduction or elimination of a spousal support award in accordance with Section 4324.5 or 4325. [¶] (n) Any other factors the court determines are just and equitable."

disparity between her support award and Dennis' income is an abuse of discretion.[18] We therefore have no basis for a finding that the court failed to consider any relevant factor of section 4320 or weighed it incorrectly and thereby abused its discretion.

### B.        Temporary Support

The dispute over temporary spousal support dates back to August 2018. Initially (in May 2015) Dennis was ordered to pay Sheri $11,400 per month in support. In August 2018, the parties entered into a stipulation that reduced the support to $5,800 per month, based on Dennis' gross monthly wages of $17,280 per month.  In addition, the stipulation provided that if Dennis' earned income exceeded $17,280 per month, he would pay Sheri 33 percent of that amount.

The stipulation also reserved jurisdiction over retroactivity.  It provided for retroactive calculation for the period between May 20, 2018, and further order of the court.  Further orders were issued after phase one of the trial, as of July 31, 2019.

At trial in 2020, Sheri claimed Dennis' earned income exceeded $17,280 per month, so he owed her 33 percent of the excess back to May 2018.  Dennis denied his earned income exceeded $17,280 per month.

The court explained that in its experience such stipulations and orders are often crafted before the accountants have finished their analysis of such issues as "controllable cash."  "When there is doubt about the [supporting spouse's] access to additional compensation over time, language can be included in support orders to allow for additional information to be reported for possible additional support calculations."  The court concluded that the stipulation between Dennis and Sheri was one such stipulation.

---

[18]        Sheri did not discuss her other resources (e.g., a rent-free home, liquid assets of over $50,000).
In her reply brief, Sheri discussed in detail some factors of section 4320 that she claimed the court overlooked or disregarded.  We do not consider arguments raised for the first time in a reply brief, as the opposing party has no opportunity to address them.  (See *Mansur v. Ford Motor Co*. (2011) 197 Cal.App.4th 1365, 1388-1389.)

The court then turned to the phrase "earned income" to determine what the parties meant by that term when they entered into the contract/stipulation. (See Civ. Code, § 1636.) The court reasoned that since Dennis' monthly wages never exceeded $17,280, the only possible basis for an "*Ostler and Smith* bump"[19] was the amount of Dennis' personal expenses paid by DFA, such as health insurance and car expenses. Accountants use these "add-backs" to determine the controllable cash available for support.

The court concluded the stipulation did *not* reflect an intention to include add-backs as if they were a bonus and part of Dennis' earned income. Instead, "the parties intended to handle the ultimate calculation of controllable cash through the inclusion of a reservation of jurisdiction for retroactivity." Until the accountants have finished their work, controllable cash cannot be accurately calculated, and certainly not monthly. Therefore extra income, assuming there is any, cannot be calculated or paid.

Sheri might be entitled to arrears based on controllable cash, the court reasoned, pursuant to the retroactivity provision of the August 2018 stipulation. She did not, however, make any such claim or provide evidence for a retroactive payment of additional spousal support. Instead she asked for 33 percent of monthly excess income. The court determined that the stipulation did not allow recovery of this kind, and since this was the only claim she had made, she had waived temporary support.[20]

On appeal, Sheri argues that section 4058 provides a definition of "income" that is much broader than what the family court used. There are two problems with this argument. The first is that the code section concerns child support, not spousal support. (See *In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1315 [statutes

---

[19] *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33. In this case, the reviewing court held that the family court had correctly included a percentage of the husband's yearly bonus, should he receive it, in the support order. (*Id*. at p. 48.)

[20] The court performed some rough dissomaster calculations and concluded that, using only the salary figures for each, Dennis had overpaid temporary support. Using controllable cash produced an underpayment "in the modest, 4-figure range."

22

governing spousal support do not define income].)  The second is that the stipulation in this case uses the term "*earned* income" to identify the source of the money from which spousal support is to be calculated.  The code section deals with income in general and – understandably – appears to be bent on casting as broad a net as possible to ensure proper support of children.

We review a matter of contract interpretation de novo.  When the court has relied on extrinsic evidence to interpret an ambiguous contract term, here "earned income," we independently review whether the contract is reasonably susceptible to the interpretation urged.  (*In re Marriage of Minkin* (2017) 11 Cal.App.5th 939, 948.)

In this case, the court drew on its experience with the way temporary support matters are typically handled in family law to assist it in interpreting the meaning of "earned income" in this stipulation.  "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."  (Civ. Code, § 1647.)

We believe the court's interpretation of the August 2018 stipulation, using its experience in family law matters, was correct.  The stipulation allowed Sheri to apply for additional support based on controllable cash when it was finally calculated.  She just failed to do it.

## DISPOSITION

The matter is remanded to the trial court to adjust the monetary value of Dennis Flynn Architects, Inc., or the portion of the marital balance sheet awarding an *Epstein* credit to Dennis Flynn for payment of the motorhome debt, or both, to reflect our conclusion that $34,428 is the initial balance of the motorhome debt as of December 31,

2018, on exhibits No. 1 and No. 29.  In all other respects, the judgment is affirmed.  The parties are to bear their own costs on appeal.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


MOTOIKE, J.