DATO, J.
*221 In August 2009, Tonya and Donald Pearson dissolved their marriage and entered into a Marital Settlement Agreement (MSA) in which they agreed to the division of their marital assets and that Donald would provide ongoing spousal support to Tonya. Despite this purported agreement, the parties engaged in extensive litigation, primarily initiated by Tonya, over the course of the next six years. Tonya now appeals from a postjudgment order of the superior court deciding various requests for orders to modify spousal support, adjudicate omitted assets, and award sanctions or attorney's fees.
Tonya asserts the court erred in its decision by: (1) concluding the term "bonus" in the MSA did not include certain restricted stock and relocation monies; (2) placing a cap on the amount of Donald's future bonuses available for support; (3) determining that she had the ability to work; (4) awarding Donald attorney's fees in the form of sanctions pursuant to Family Code section 271[1] ; and (5) denying her request for additional needs-based attorney's fees pursuant to section 2030. With respect to most of these rulings, we conclude the court did not err. With respect to the orders modifying spousal support, we conclude the court correctly determined that Donald's increase in bonus pay constituted a change of circumstances sufficient to warrant a modification of spousal support, but that substantial evidence does not support *918 certain of the court's findings regarding Tonya's ability to work. We therefore affirm in part, reverse in part, and remand the matter for limited further proceedings in accord with this opinion.
FACTUAL AND PROCEDURAL BACKGROUND
Donald and Tonya were married for over 30 years. During their marriage, Tonya primarily stayed home with their children while Donald supported the family financially and furthered his career in the banking industry. As a bank executive, Donald received a substantial salary, as well as cash bonuses and long-term incentives in the form of stock options and restricted stock.
*222 The couple separated in January 2008. Donald's annual income at the time of the separation was approximately $300,000 per year, including his base salary and annual cash bonuses. Tonya was not working at the time of the separation but obtained a job as a receptionist shortly thereafter.
The couple began negotiating the terms of the divorce and, in May 2008, vocational expert Kathleen Young provided an opinion regarding Tonya's wage-earning capacity. Young noted that Tonya was earning $15 per hour but was only working 20 hours per week in her current position, and concluded Tonya had the potential to work a full 40 hours per week while earning approximately $15-16 per hour. She opined that Tonya's earning capacity would not increase significantly with further training, but suggested Tonya ask her employer about courses within the financial industry that might provide upward mobility in her current position.
Young identified a number of available full-time positions that Tonya was qualified for, but suggested she stay in her current position for the next six months with the goal of converting it to a full-time position, as the job market was competitive and Tonya might be subject to age discrimination. Tonya's job did not become full time and, instead, she was laid off just a few months later. Thereafter, she returned to a previous employer to work part time as a retail sales associate, making $10.85 per hour.
In August 2008, Donald accepted a new position with his employer, Wells Fargo, that required him to move to Oregon. He negotiated a significant increase in his base salary, along with an agreement that Wells Fargo would provide a substantial relocation package and pay his bonus for 2008 based on his performance in his current region, as the region he was to take over was not doing as well. Tonya learned of the relocation no later than November of that same year.
Marital Settlement Agreement
After stipulating to a temporary support order, Donald and Tonya attended a mandatory settlement conference and reached an agreement regarding the division of marital assets and ongoing spousal support. Tonya's attorney read the agreement into the record and also filed a written MSA delineating the terms of the agreement. The agreement required Donald to pay Tonya spousal support in the amount of $7,500 per month plus 35 percent of "any gross bonuses received by [Donald], commencing August 15, 2009, and continuing thereafter until the death of either party or the remarriage of [Tonya], whichever occurs first, subject to the jurisdiction of the Court to alter, modify, or terminate this provision upon a proper showing having first been made to the Court." The agreement noted the spousal support was premised on *223 Donald's monthly income of approximately $25,000 per month, less expenses, and an imputation of 40 hours of work per week at an hourly rate of $16 for *919 Tonya. The court incorporated the written agreement into a final judgment of dissolution entered on December 8, 2009.
Thereafter, and over the course of the next five years, Tonya and Donald engaged in extensive litigation related to the MSA. Although a full review of the litigation is not necessary, we summarize certain of the intermediate proceedings relevant to Tonya's arguments before turning to the details of the August 2016 postjudgment order at issue in the present appeal.
June 2010 Request for Modification
Less than a year after the court entered the MSA, Tonya filed her first request for orders (RFO) asking the court to modify the spousal support agreement. Donald's annual bonus for 2009 had been significantly lower than previous years[2] and, although it was primarily due to the poor performance of the region he had recently taken over, Tonya read some articles discussing changes to the compensation of executives in the banking industry and believed Donald may have received additional shares of restricted stock or stock options in lieu of a portion of his typical cash bonus. In addition, Tonya asserted she was only working part time for less than $15 per hour, and had been unable to find another more lucrative position. She therefore asked the court to award her additional support, and also argued the court should interpret the bonus provision in the MSA to include 35 percent of any stock options that Donald received in lieu of a cash bonus. In response, Donald filed a motion for sanctions claiming that Tonya submitted her motion to modify support in bad faith.
Judge Pollack heard the RFO and questioned Tonya about her understanding of the bonus clause at the time she agreed to the MSA. Their exchange was as follows:
"The Court: Okay, let me ask you some questions, and I'm going to tell you in a moment why I think it might be significant. In your mind, did you see bonus different than stock options? Ms. Cleary says she sees them as different concepts.
"[Tonya]: Yes, definitely.
"The Court: Why 'definitely'? Why is that different?
*224 "[Tonya]: Because a bonus is something you get every year, you have to cash them out. Stock option is something you got every year.
"The Court: But at the time you entered into this agreement, 35 percent of any bonuses, you were thinking the year-end cash bonus?
"[Tonya]: Yes.
"The Court: And you were not thinking of stock options, exercising stock options?
"[Tonya]: I asked about the stock options. I don't-I was-only thought that I could get the ones that were awarded during the marriage, that was my understanding.
"The Court: All right. I want to be clear on this then. 35 percent of gross bonuses that you agreed to, in your mind, you felt that was 35 percent of the year-end cash bonus as opposed to 35 percent of the stock options; is that correct?
"[Tonya]: Well, I knew there was a difference, but as I tried-we had used cash from stock options to live the last seven years.
"The Court: Well, that wasn't my question. I'm trying to go into your state of *920 mind at the time you signed this agreement, when you agreed to 7500 per month, plus 35 percent of gross bonuses, did you think the gross bonuses were limited to the year-end cash payment?
"[Tonya]: Yes.
"The Court: Okay. All right.
"[Tonya]: I was not aware I could get the other."
Judge Pollack issued a written decision on the RFO in February 2012. He found that Tonya was aware Donald had accepted a new position and a relocation package at the time of the agreement, such that any related payments Donald received would have been included in the MSA as arrears. Similarly, he concluded that any amounts due to Tonya related to stock options Donald received between separation and August 15, 2009, would have been included in the MSA as arrearages, as the MSA divided the options received before the date of separation. Based on her testimony at trial, the court found that Tonya understood the term "bonus" in the MSA to refer specifically to the year-end cash bonus Donald typically received, and not the *225 stock options. Thus, by terms of the parties' own agreement, stock options received after entry of the MSA were Donald's separate property and were not bonus income.
Addressing spousal support more generally, Judge Pollack found that the marital standard of living at the time of separation had been $300,000 per year, that Tonya continued to earn approximately the same wages as she did at the time she negotiated the MSA, and that as a result there had been no material change in circumstances sufficient to justify a change in spousal support. Finally, the court denied Donald's motion for sanctions and awarded Tonya $10,000 in attorney's fees and costs pursuant to section 2030-compensating her for only a portion of the $44,000 in fees she accrued in connection with the RFO.
Dispute Regarding the Qualified Domestic Relations Orders (QDROs)
In 2012, another dispute arose regarding the division of stock options as set forth in the MSA. Donald's attorney had prepared qualified domestic relations orders (QDROs) to split the 401(k) plan funds accumulated prior to the separation, and Tonya's attorney requested several changes. Although Donald's attorney attempted to incorporate the changes, the parties failed to reach an agreement and Donald filed a request for an order to have an Elisor appointed to sign the QDROs on Tonya's behalf. Tonya opposed Donald's request and asserted that the QDROs did not fairly account for all of the 401(k) funds, but was unable to effectively explain her concerns to the court. Judge Pollack heard the motion and appointed the Elisor. Thereafter, Donald submitted the signed QDROs to Wells Fargo, but Wells Fargo rejected them as they contained language inconsistent with the retirement plan's guidelines.
January 2013 RFO Seeking a Modification to Spousal Support
In January 2013, Tonya filed another RFO in which she again sought to modify spousal support. She also asked the court to adjudicate omitted assets, to appoint a special master to perform an accounting and determine the marital standard of living, and to award her attorney's fees and costs. Tonya explained that her physician had diagnosed her as having bilateral osteoarthritis in both hands, she had left her employment as a sales associate in October 2012 as a result (subject to a worker's compensation claim), and she was unsure when, or if, she would be able to return to work. She stated she was currently unable *921 to meet all of her monthly financial obligations-which included a first and second mortgage on the family home she received *226 pursuant to the MSA[3] and monthly payments on a number of credit cards-but also declared that she had over $400,000 in assets and still expected to receive 50 percent of Donald's various 401(k) accounts.
In response, Donald argued that Tonya's claims were baseless because Judge Pollack had already decided the same issues in the February 2012 Statement of Decision and that the RFO was a continuation of "her persistent and endless litigation over the same issues." He therefore asked the court to sanction Tonya pursuant to section 271.
In a supplemental declaration, Tonya asserted that Donald failed to disclose certain marital assets and, in a subsequent related pleading, she again claimed that Wells Fargo was providing a portion of his bonus in the form of stock instead of cash and that Donald had concealed associated changes to his bonus plan. Donald denied hiding any assets or changes to his bonus plan. He conceded that his base pay and bonuses had increased since separation but asserted there was no basis for Tonya to claim a share of his increased earnings post-separation because the MSA fairly accounted for the marital standard of living at the time of the separation. He alleged Tonya had not worked full time since their separation, despite the imputation of income based on working 40 hours per week in the MSA; that Tonya's employer had denied her disability claim; and that he had recently witnessed her driving and holding an umbrella for an extended period without a wrist guard. He argued there was no justification for an increase in spousal support, and instead asked the court to decrease the amount of spousal support and award him sanctions under section 271 based on Tonya's consistent and "vexatious" litigation.
May 2013 RFO to Set Aside the QDROs and Motion to Dismiss Previous RFOs
In May 2013, Tonya filed an RFO asking the court to set aside the Elisor-signed QDROs based on her allegations that Donald had hidden certain 401(k) accounts. She also requested an award of sanctions pursuant to section 271 and needs-based attorney's fees and costs. In August, she filed an ex parte request to dismiss her January 2013 RFO, explaining that the parties had resolved their disputes as to many of the allegedly omitted assets. She maintained her most recent request that the previously executed QDROs be set aside. Donald opposed the dismissal, based on the history of litigation between the parties, and the court denied Tonya's request.
*227 December 2013 Ex Parte Request for Fees
In December 2013, Tonya filed another RFO for needs-based attorney's fees, asserting that she needed $100,000 to obtain an attorney prior to the evidentiary hearing on her other pending RFOs. Judge Powazek heard the request in early 2014 and, after considering the extensive history of contentious litigation between the parties and their relative financial capabilities, awarded Tonya $15,000 toward "her reasonable attorney's fees necessary to litigate only the issues before the court." Thereafter, the court closed discovery and set a long-cause hearing for September 2014 to address Tonya's remaining RFOs. Around the same time, Donald accepted another promotion and relocation, which *922 included another substantial increase in pay and a generous relocation package.
RFO to Reopen Discovery , Continue the Trial Date , and Revisit Judge Pollack's 2012 Statement of Decision
In August, a month before the scheduled long-cause hearing, Tonya filed another RFO asking the court to continue the trial date and reopen discovery, based primarily on allegations that Donald had concealed information and Wells Fargo had produced false information in response to her subpoenas. She also filed a second RFO asking the court for a "judgment different than that announced," to correct a clerical error, and for additional attorney's fees and costs. Tonya claimed she never received a copy of Judge Pollack's February 2012 Statement of Decision or any associated findings and orders after hearing. She asked that the court reconsider the decision and argued it was erroneous because Donald had concealed information regarding his accounts and assets and Judge Pollack had improperly relied on the MSA to determine the marital standard of living. Regarding the clerical error, she asserted the parties had stipulated in 2009, before entry of the MSA, that Donald would pay her 35 percent of any bonus payment received that year, but the related order, also entered before the MSA, left out the words "this year".
The case was assigned to Judge Oberholtzer. A hearing was set to address Tonya's latest RFOs with the pending RFOs to modify support, conduct an accounting, and for sanctions to trail. Judge Oberholtzer concluded that Judge Pollack's February 2012 Statement of Decision was a final order and denied Tonya's request to correct the alleged clerical error in the earlier 2009 order. He also denied Tonya's request to reopen discovery and found that the pending issues were "not that complex." He awarded Tonya an additional $15,000 in attorney's fees and continued the trial on the remaining RFOs from September to November 2014.
*228 Evidentiary Hearing
After further delays, in August 2015 Judge Oberholtzer held an evidentiary hearing on Tonya's RFOs to modify spousal support and for an accounting, as well as the associated competing requests for sanctions. At the hearing, Tonya testified that when she previously testified she thought "bonus" in the MSA meant Donald's cash bonuses, she was including any money he received from cashing in stock as well. She conceded, though, that she was essentially asserting the same claim as she made before Judge Pollack, and also testified that she was on medication and thus was not thinking clearly when she answered Judge Pollack's questions at the previous hearing.
Regarding her medical condition, Tonya testified that she began experiencing pain sometime in 2010 and began seeing Dr. Gelb in October 2012. She stopped working after her first appointment with Dr. Gelb based on his recommendation. She stated it was painful to open doors, handle papers, pinch, grasp, pick up money or do several other tasks. She admitted she had not made efforts to find a job that would accommodate her medical condition, but also indicated she was not aware of any such jobs given the array of issues she was facing.
Dr. Gelb also testified regarding Tonya's medical condition and the related limitations. When asked about her ability to type on a keyboard, Dr. Gelb stated she could probably do so, but that she had small joint arthritis in her fingers and the pain in her thumbs would be aggravated by the use of the space bar. He said she would need to do a work evaluation with an occupational *923 therapist to determine more specifically how and for how long she could use a keyboard. Ultimately, he concluded the totality of her numerous ailments, many of which had been objectively verified by clinical findings, made her ability to perform any work (other than sedentary work that did not require any manipulation of her hands) extremely limited.
Donald testified that he did not believe Wells Fargo made any significant changes to the structure of the bonus programs applicable to him since the date of his separation from Tonya, and that he had never received restricted stock or any other form of payment other than cash in connection with his annual bonus. In addition, he stated that his compensation, including his bonus plans, followed the same structure as other individuals at Wells Fargo with the same position in different locations. He explained that his compensation package changed along with his job title when he moved to Oregon, and that his bonus the first year was unusually low due to the market and the performance of his region, but that his base salary and bonuses increased thereafter due to his promotions.
*229 Judge Oberholtzer's January 2016 Statement of Decision
Judge Oberholtzer issued a written statement of decision-the decision Tonya now challenges on appeal-in January 2016. He found that there had been some confusion about the 401(k) funds, and specifically that both parties lost track of certain nonqualified plans that had been split off from the qualified plans, but that Donald had not intentionally concealed any funds and Tonya had been aware of their existence for some time. While the QDROs that the Elisor signed did not properly divide all of the funds, the court noted that the discrepancy could have been resolved much sooner if Tonya had clearly explained the issue and the parties had taken the time to examine one another's objections. Thus, the court found the errors in the QDROs were the result of a mistake, both parties shared some of the blame, and there were no intentionally omitted assets.
Regarding the term "bonus," the court explained that a spousal support order setting a fixed monthly support amount as well as a percentage of an annual bonus was a common arrangement as set forth in Marriage of Ostler & Smith (1990) 223 Cal.App.3d 33, 40, 272 Cal.Rptr. 560 ( Ostler & Smith ). Thus, in this context, the term "bonus" typically refers to "additional remuneration paid to an employee for meeting or exceeding performance goals in the past" and is distinguishable from stock options. Thus, although the court acknowledged that "bonus" could have a broader meaning in other contexts, it concluded the term referred only to a variable performance bonus in the context of the MSA in this case. Further, the court noted Tonya's testimony confirming that, at the time she agreed to the MSA, she interpreted the bonus provision in a manner consistent with the court's interpretation of the term. Accordingly, Judge Oberholtzer determined that the term "bonus" excluded both the restricted stock rights Donald received as part of a long-term incentive plan and the relocation monies he received in accordance with his promotions.
As to spousal support more generally, the court found there was a change of circumstances necessitating a modification of spousal support, not because of Tonya's inability to work but rather because of the significant increase in bonus pay that Donald had received following his two promotions. The court therefore modified the provision of the MSA requiring Donald to pay 35 percent of any bonus to Tonya as spousal support by setting a cap of *924 $250,000 on the amount of Donald's annual bonus available for support.
With respect to Tonya's ability to work, the court went on to address the factors set forth in section 4320. In that context, it found that Tonya had not followed up on the recommendations for acquiring additional skills set forth in the 2008 vocational evaluation, and that her treating orthopedic surgeon, *230 Dr. Gelb, did not agree she was unable to work. The court conceded that Dr. Gelb had testified Tonya had some limitations, but found that Tonya had no restrictions using a keyboard, nothing precluded her from working full time, and most of her complaints could be ameliorated by surgery. The court also addressed the remaining section 4320 factors, noting specifically that spending had been a source of friction throughout the marriage and that it appeared Tonya had continued to overspend after the marriage despite her limited ability to work. Thus, the court declined to make any modifications to the spousal support beyond the cap on Donald's bonuses.
Regarding sanctions, the court noted that Tonya had repetitively filed motions and then tried to dismiss them after much of the preparation was done only to refile the same motion again later. It documented its conclusions in this regard by attaching a list of Tonya's various motions over the years. Regarding the QDROs, the court found that Tonya had available to her all of the information necessary to resolve the issue but instead chose to accuse Donald of fraud and engage in frivolous litigation. Thus, the court sanctioned Tonya pursuant to section 271 in the amount of $50,000. To avoid imposing an unreasonable financial burden on Tonya, the court permitted Donald to withhold $25,000 per year from the amount he paid as her share of the annual bonus, to begin only after she paid off additional amounts owed to him in a similar manner.
Concerning needs-based attorney's fees and costs, the court reiterated that Tonya had engaged in unnecessary litigation and that she had already been awarded $15,000 as the amount reasonably necessary to pursue her claims. Therefore, the court declined to award Tonya any additional attorney's fees or costs.
DISCUSSION
I.-II.**
III. Sanctions and Attorney's Fees
Finally, we address Tonya's assertions that the court erred in awarding Donald sanctions and in refusing to award her additional needs-based attorney's fees.
*231 A. The Court Did Not Err When It Sanctioned Tonya
As an initial matter, we note that the trial court made extensive findings regarding Tonya's overly litigious conduct, including an appendix containing a list of all of Tonya's motions over the past five years. Tonya does not dispute this list, or the court's associated findings. Instead, she challenges the court's order to the extent it allows Donald to withhold the sanctions from her percentage of future bonus payments. She also argues that the sanctions award imposed an unreasonable financial burden on her.
1. Section 271 does not preclude an order allowing the supporting party to deduct sanctions from a variable component of the spousal support award
We turn first to Tonya's contention that the order violated the statute.
*925 Section 271 subdivision (c), states, "[a]n award of attorney's fees and costs as a sanction pursuant to this section is payable only from the property or income of the party against whom the sanction is imposed." Tonya asserts that spousal support is not income and that this provision thus precluded the court from allowing Donald to withhold a portion of her spousal support to satisfy the sanctions award. We disagree.
Statutory interpretation is a question of law that we review de novo on appeal. ( Bruns v. E-Commerce Exchange , Inc. (2011) 51 Cal.4th 717, 724, 122 Cal.Rptr.3d 331, 248 P.3d 1185.) "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." ( Coalition of Concerned Communities , Inc. v. City of Los Angeles (2004) 34 Cal.4th 733, 737, 21 Cal.Rptr.3d 676, 101 P.3d 563.)
When enacting section 271, the Legislature was primarily concerned with ensuring that the party sanctioned by the court would be the one responsible for paying the sanction. (See In the Marriage of Daniels (1993) 19 Cal.App.4th 1102, 1107-1111, 23 Cal.Rptr.2d 865 [discussing the legislative history, including that one purpose of the statute was to make parties liable for conduct that frustrated public policy favoring settlement by imposing sanctions directly on the party].) However, because the statute also includes the *232 phrase "from the property or income of the party," we must determine whether the Legislature intended to exclude spousal support from "income" as that term is used in the statute. (See Tuolumne Jobs & Small Business Alliance v. Superior Court (2014) 59 Cal.4th 1029, 1038-1039, 175 Cal.Rptr.3d 601, 330 P.3d 912 ["It is a maxim of statutory interpretation that courts should give meaning to every word of a statute and should avoid constructions that would render any word or provision surplusage."].)
The Family Code does not specifically define "income" for purposes of section 271. But section 4061 does explain that for purposes of allocating additional child support obligations in proportion to the parents' net disposable income, "the gross income of the parent receiving the spousal support shall be increased by the amount of the spousal support received for as long as the spousal support order is in effect and is paid."[7] (§ 4061, subd. (c).) Similarly, it is well settled that spousal support is includable in gross income for tax purposes. (See Hogoboom & King, Cal. Prac. Guide-Family Law (TRG 2017 rev. ed.) ¶ 10:504.) Thus, the standard income and expense declaration, form FL-150, that the court requires parties to file in connection with requests for orders to modify spousal support lists spousal support from either the marriage at issue or a different marriage as a form of reportable income. Not surprisingly then, courts have referred to *926 spousal support as "income" in the context of sanctions awards. (See, e.g., In re Marriage of Petropoulos (2001) 91 Cal.App.4th 161, 180, 110 Cal.Rptr.2d 111 ["Wife also receives income from rental properties, part-time work, and spousal support."].) As there is no indication the Legislature intended to preclude the payment of sanctions from spousal support funds, we decline Tonya's request that we exclude spousal support from the meaning of the term "income" in section 271 subdivision (c).
Moreover, the cases Tonya relies on to support her contention are not applicable in this context. In In re Marriage of Heiner (2006) 136 Cal.App.4th 1514, 39 Cal.Rptr.3d 730, the court concluded funds a party received in connection with the judgment in a separate lawsuit was not income available for payment of child support because it was for the specific purpose of reimbursing the losses of the party. ( Id . at p. 1526, 39 Cal.Rptr.3d 730.) The court did not address whether the funds were "income" more generally, or whether they would be available for sanctions. ( Ibid . )
In the other cases Tonya cites, the appellate courts concluded that the trial courts improperly denied an award of needs-based attorney's fees *233 without considering the relative income and needs of the parties as required by section 4320, because a party should not have to use payments necessary for support to pay for their own attorney's fees. (See In re Marriage of Tharp (2010) 188 Cal.App.4th 1295, 1315-1316, 116 Cal.Rptr.3d 375 ; In re Marriage of Hatch (1985) 169 Cal.App.3d 1213, 1220, 215 Cal.Rptr. 789.) Sanctions, however, are a different matter. Moreover, in section 271 the Legislature included a separate provision requiring the court to consider whether the sanction would impose an unreasonable financial burden. ( § 271, subd. (a) ["The court shall not impose a sanction pursuant to this section that imposes an unreasonable financial burden."].) As suggested in Marriage of Hatch , supra , at p. 1221, 215 Cal.Rptr. 789, even in the context of a financial need analysis pursuant to section 4320, there may be an exception where support is sufficient to allow the party to spend funds in addition to covering their basic needs. Thus, section 271 itself addresses the concern that a party should not use support necessary for their basic needs to pay sanctions through the separate financial burden requirement. We accordingly conclude the statute does not preclude the payment of a sanctions award from spousal support funds so long as the reduction in funds does not create an unreasonable financial burden.
2. The sanctions award did not impose an unreasonable financial burden
It remains to be determined whether the sanctions award imposed an unreasonable financial burden on Tonya. We review the sanctions awards pursuant to section 271 for an abuse of discretion. (See In re Marriage of Burgard (1999) 72 Cal.App.4th 74, 82, 84 Cal.Rptr.2d 739.)
Here, Tonya reported her net worth in August 2009 to be over $1.5 million. Around the time of the award, Tonya reported somewhere between $266,000 and $400,000 in assets, was about to receive one-half of the 401(k) funds accumulated during the course of the marriage, and was receiving increasing annual support amounts that exceeded the support necessary to maintain her marital standard of living. Further, the court spread out the $50,000 sanction award specifically to minimize any associated burden, and permitted Donald to withhold the amounts from Tonya's percentage of his already variable annual bonus over the course of two years *927 and only after Tonya had paid back other amounts that she owed.
Tonya contends the trial court made incorrect assumptions regarding her assets and debts. To the contrary, however, the court specifically found that Tonya signed income and expense declarations establishing these amounts under oath, and had no incentive to overestimate her net worth at the time she *234 did so. Further, much of her substantial legal debt was incurred by aggressively pursuing largely unnecessary litigation in a manner that resulted in the very sanctions she now disputes.
Tonya also asserts the court failed to acknowledge that sanctions would result in support payments insufficient to cover her monthly expenses. But the purpose of spousal support is not to cover any and all expenses, and the court also specifically found that Tonya had mismanaged her money and routinely overspent. (See § 4320; In re Marriage of Murray (2002) 101 Cal.App.4th 581, 594, 124 Cal.Rptr.2d 342 ; In re Marriage of Schulze (1997) 60 Cal.App.4th 519, 525, 70 Cal.Rptr.2d 488.) Similarly, Tonya complains that her shortfall will only increase if Donald does not receive the maximum bonus in any given year. But it has always been possible that Donald's bonus would be significantly lower in any given year, as it was in 2009. Contrary to Tonya's assertions, the structure of the MSA that Tonya agreed to, which included a fixed monthly support payment of $7,500 as well as a variable amount based on a percentage of Donald's bonuses, indicates that a reduction in the amount of the already variable support that Tonya receives will not impose an unreasonable financial burden on her.
We therefore conclude that the trial court did not abuse its discretion by awarding $50,000 in sanctions against Tonya, payable by a reduction in the support due as a percentage of Donald's annual bonuses over the course of two years. (See also In re Marriage of Falcone & Fyke (2012) 203 Cal.App.4th 964, 989, 138 Cal.Rptr.3d 44 [interpreting an order that wife pay sanctions from her remaining portion of a fund split pursuant to a dissolution order as not limiting the source of sanctions, and affirming the order].)
B. The Court Did Not Err When It Refused to Award Tonya Additional Needs-Based Fees
Tonya also argues that the court erred in refusing to award her additional needs-based fees pursuant to section 2030. In dissolution and support proceedings, the court may order one party "to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the costs of maintaining or defending the proceeding." (§ 2030, subd. (a).) The trial court should consider "the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately," and may consider a number of factors, including the nature and complexity of the litigation, the efforts of the parties to resolve as many areas of disagreement as possible without judicial intervention, and its own experience in determining the reasonable value of the services rendered. (§ 2032, subd. (b); In re Marriage of Jovel (1996) 49 Cal.App.4th 575, 588, 56 Cal.Rptr.2d 740 ( Jovel ).) The court has *235 broad discretion in determining the amount of fees to award and, on appeal, we review any such award for an abuse of that discretion. ( Jovel , supra , at p. 588, 56 Cal.Rptr.2d 740.)
Here, the court had already awarded Tonya some fees in connection with the present litigation, but declined to award her additional fees because it found that *928 much of the litigation had not been necessary. It relied on many of the same findings it had made in connection with the sanctions award and, as noted, attached an appendix listing the various motions Tonya filed over the course of the previous six years. Tonya responds that the court erred in determining that much of the present litigation was not reasonably necessary. In particular, she claims the trial court specifically acknowledged that the litigation regarding the QDROs was necessary because Donald had failed to include certain accounts in the QDROs. To the contrary, however, the court specifically found that her continued litigation over the QDROs was frivolous, and noted that the issue could have easily been resolved a long time ago and that Tonya "shared the blame" as she failed to articulate her reason for objecting to the Elisor and instead accused Donald of fraud.
Tonya also asserts that the litigation over her ability to work was necessary. But as the trial court noted, Tonya litigated this issue continuously over the years and the court had previously awarded needs-based fees in connection with the current requests for orders, as well as previous such requests. As the record supports the trial court's findings regarding Tonya's unnecessary and overly litigious conduct, we defer to the court's determination of the reasonable amount of attorney's fees necessary for the litigation. ( Jovel , supra , 49 Cal.App.4th at p. 588, 56 Cal.Rptr.2d 740.)
Tonya also contends the court failed to consider the factors enumerated in section 4320 in determining the amount of the award. However, the court did make detailed findings in a separate portion of the written decision regarding the section 4320 factors, and we presume the court applied those same findings when deciding the sanctions motion. Moreover, the court declined to award fees primarily because it found the fees Tonya requested were not reasonably necessary, such that the section 4320 factors were not particularly significant in this context.
Nonetheless, because we remand to the superior court for further consideration of one of the section 4320 factors, Tonya's ability to work, we also direct the court to consider whether any change in its analysis regarding that factor also impacts its refusal to award additional needs-based attorney's fees to Tonya pursuant to section 2030.
*236 DISPOSITION
The order is reversed in part, and the matter is remanded to the superior court for further consideration of whether Tonya is able to work and what effect, if any, her inability to do so should have on the amount of spousal support and attorney's fees, consistent with the analysis provided in this opinion. In all other respects, the order is affirmed. The parties shall bear their own costs on appeal.
WE CONCUR:
McCONNELL, P. J.
BENKE, J.

Further statutory references are to the Family Code unless otherwise stated.

Thereafter, Donald's annual income and Tonya's annual spousal support payments increased each year, eventually surpassing the amount both parties received in 2009, the first year after the separation.

The MSA indicated Tonya would receive the home as her sole and separate property "at a value of $630,000 subject to Wife's separate property claim of $35,142 and debt of $75,000." She was required to refinance the loan on the home to remove Donald's name.

See footnote *, ante .

Whether spousal support is "income" in a general sense, and whether it is income "available for child support" are two different things. Thus, section 4058 characterizes spousal support as income to the supported spouse, but excludes as not available for child support any spousal support being paid by another party to the proceeding.