Filed 2/27/23  Marriage of Pourmoradi CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re the Marriage of ANDREA and JOHN POURMORADI. _____ ANDREA POURMORADI, Appellant, v. JOHN POURMORADI, Respondent. | B308938, B312579 (Los Angeles County Super. Ct. No. BD527978) |

APPEALS from a judgment and a postjudgment order of the Superior Court of Los Angeles County, Mark A. Juhas, Judge. Appeal from judgment dismissed (B308938); postjudgment order affirmed (B312579).

Gary J. Cohen, Gary J. Cohen; Benedon & Serlin, Gerald M. Serlin and Kelly Riordan Horwitz for Appellant.

Complex Appellate Litigation Group, Kirstin M. Ault, Claudia Ribet; Jaffe Family Law Group, Daniel J. Jaffe and Sandra P. Mendell for Respondent.

Andrea Pourmoradi appeals from a judgment and an order entered in heavily litigated marital dissolution proceedings with John Pourmoradi.[1]  Andrea contends the family court improperly sanctioned her by awarding John $700,000 in attorney fees and costs under Family Code section 271.[2]  That statute empowers the court to impose attorney fees and costs as sanctions against litigants whose conduct undermines the policy of promoting settlement of litigation and cooperation of the litigants, and increases litigation costs.  (§ 271, subd. (a).)  Finding no abuse of discretion, we affirm the sanctions order.  Because Andrea's appellate briefs do not present an argument as to why she believes the family court erred in rendering its judgment, we deem the appeal from the judgment abandoned and dismiss it on that basis.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.    Overview**

John and Andrea were married on January 15, 1989, and have two children, now adults.  The parties separated, and Andrea petitioned for dissolution of their marriage in July 2010.  Judgment was entered dissolving the marriage in April 2017 with the family court reserving jurisdiction over all other issues, mainly involving the division of property.  Those issues were litigated in January and February 2020.

---

[1] Although Andrea Pourmoradi's name was restored to Andrea Schreiber by the April 14, 2017 status-only judgment, consistent with the family court proceedings, we use her prior surname.  As is customary, however, we generally refer to both parties by their first names.

[2] Undesignated statutory references are to the Family Code.

The family court issued its final judgment on September 10, 2020, confirming the rulings made in its statement of decision, rejecting each of Andrea's claims, and dividing the community property equally in kind. The court reserved jurisdiction to consider later requests for support and attorney fees, costs, and monetary sanctions.

On October 8, 2020, John sought an award of $2,114,229 in attorney fees and costs under section 271. Andrea filed opposition. Following a hearing, the family court awarded John $700,000 in sanctions against Andrea.

Andrea appealed from the September 10, 2020 judgment entered in the dissolution proceeding. She later appealed from the postjudgment order awarding section 271 sanctions to John. We ordered the appeals consolidated.

## II.    Summary of Pertinent Property Issues

Andrea's sole challenge on appeal is to the postjudgment order imposing section 271 sanctions. Andrea is not contesting the factual findings in the family court's statement of decision concerning property issues, which included the results of related federal court and superior court actions. We therefore summarize only those findings of the 57-page statement of decision that pertain to John's section 271 sanctions request, Andrea's opposition, or the court's sanctions award, and/or otherwise provide context for the issues on appeal.

### A.    FSGM

Apart from their family residence, the parties' primary asset was their 50 percent interest in Four Seasons General Merchandise, Inc. (FSGM). The business was also their primary source of income. FSGM imported mainly Chinese merchandise to be sold to independent discount stores. FSGM's 50 percent co-

3

owner was Behruz Gabbai (Gabbai). He was involved in every aspect of FSGM, except purchasing and product safety, which John oversaw. Andrea was not involved with the operation of FSGM.

Due to global economic downturns, FSGM's annual sales declined from over $100 million to $24.4 million from 2006 through 2018. In 2013, Gabbai blocked the sale of FSGM to Point Capital Partners. This was one of several actions Gabbai took to destabilize FSGM until it ceased operations on June 15, 2018.

### B.    2801 East Vernon LLC

The parties' ownership interest in FSGM included a 50 percent interest in two commercial buildings in Vernon. One of them, 2801 East Vernon Avenue, housed FSGM's headquarters, showroom, and warehouse.

In December 2009, at Gabbai's urging and after meeting with an attorney at Andrea's direction, John, Andrea, and Gabbai signed a grant deed transferring the 2801 Vernon property into 2801 East Vernon LLC. On the same day, John and Andrea signed multiple loan documents identifying 2801 East Vernon LLC as the borrower.

Disagreements with Gabbai led the parties in 2017 to jointly retain attorneys to represent them in legal proceedings to separate their interest from Gabbai's interest in the two commercial buildings in Vernon: a partition action and an involuntary dissolution of 2801 East Vernon LLC. In response, Gabbai sought to acquire the parties' 50 percent ownership interest of 2801 East Vernon LLC under Corporations Code section 17707.3, subdivision (c), and appraisers were appointed. John and Andrea unsuccessfully requested an alternate valuation

4

date. In 2019, the superior court accepted an appraisal that was $1,425,000 below the stipulated market value.

The family court rejected Andrea's claims, as unsupported by the evidence, that she was unaware of the property transfer to the 2801 East Vernon LLC and that John should be charged with the $1,425,000 difference in valuation and with rent and other costs that Gabbai had failed to pay.

When the bill for the legal fees of the parties' jointly retained attorneys became due, Andrea refused to countersign the wire transfer instructions for payment. As a result, the parties lost a discount they would have received with timely payment. Instead, the parties were obligated to pay interest on the outstanding balance, which accrued until a court order released funds from their joint accounts. In addition, Andrea hired her own counsel, who, the family court found, interfered with the litigation and allowed Gabbai to take advantage of the parties' conflicting positions.

### C. DEA Investigation and Corporate Guilty Plea

In 2015, FSGM was federally charged with aiding and abetting the operation of an unlicensed money transfer business after the Drug Enforcement Agency (DEA) froze FSGM's bank accounts and conducted an investigation. Pursuant to a plea agreement, FSGM was placed on three years' probation and forfeited $1,665,661.99.[3]

John was in no way implicated in the offenses and was not a party to the plea agreement. Andrea was never a target of the DEA investigation.

---

[3] Trial in this matter was delayed for years until the DEA investigation and federal charges were resolved.

5

In 2016, Andrea retained counsel, who informed federal prosecutors that John was "a fugitive from justice," "had purchased a home" in Beverly Hills (a claim Andrea later withdrew), and had hidden away "an additional $50-100 million." Andrea also provided prosecutors with documents and accused John of " 'pure money laundering.' "

Andrea's counsel received thousands of pages of documents from John's counsel relating to the investigation. After entry of a stipulated protective order, Andrea, nonetheless, told family members and business people about the DEA investigation.

Andrea also filed a petition in federal district court seeking 25 percent of the funds that FSGM paid under the plea agreement. Her petition was later dismissed on the federal prosecutors' motion.

The family court rejected Andrea's claims that John should be held responsible and compensate her for any amount of legal fees and loss of funds incurred and paid by FSGM concerning the DEA action and corporate guilty plea.

### D.    Julie Oun Loans

Julie Oun (Oun) was a buying agent for FSGM. She helped John obtain merchandise from China. In 2006, Oun loaned FSGM $8,680,477 toward the purchase of a Garfield Avenue property in Paramount for a new FSGM headquarters. In 2009, Oun loaned Andrea and John $2,585,000 to pay off the existing mortgage on their residence and replace it with a lower interest loan.

The family court found there was no evidence the loans were made with community funds funneled through John as Andrea claimed. Instead, the evidence showed they were "real" loans extended by and repaid to a third party; none of the repaid

6

funds was given to John. Accordingly, there was no community interest in the fully repaid loans and, contrary to Andrea's assertion, no basis to charge John with repayments.

The family court rejected Andrea's argument that under an expanded view of *In re Marriage of Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th 1252 (*Margulis*), the burden of proof should shift to John to disprove that Oun's money was his.[4] The court determined that even if it accepted Andrea's novel interpretation of *Margulis,* the evidence did not support its application to this case.

### E. Morris Matloubian's Alleged "Blackmail"

John and Andrea maintained bank accounts in Israel and Switzerland that they failed to disclose in their tax filings and on which they had not paid federal taxes.

Morris Matloubian (Matloubian) was FSGM's controller/CFO from 1992 through 2007, when he voluntarily terminated his employment. Before leaving, Matloubian purportedly threatened to disclose the existence of the foreign bank accounts unless he were paid $1 million. Matloubian was paid $900,000 and denied it was blackmail.

The family court agreed with Andrea's contention that Matloubian's demand for payment had been "blackmail" but found the evidence established the amount John paid was $450,000, not the entire $900,000 as Andrea claimed. The court

---

[4] In *Margulis, supra,* 198 Cal.App.4th at page 1265, the husband had exclusive control and management of the community assets, and, as managing spouse, had the best knowledge of where the assets and accounts were located. The court shifted the burden of proof on the missing community assets to the managing spouse. (*Id.* at p. 1268.)

rejected Andrea's assertion that she was entitled to either an offset or a reimbursement for John's use of community funds to pay the blackmail. The court found the payment benefited the community equally by resolving threatened litigation and protecting the community from "serious adverse consequences."[5]

The family court also found both parties were aware of, participated in, and financially benefited from the foreign accounts and their nondisclosure to the United States government. Nor did John breach any fiduciary duty to Andrea regarding the payment. The court further found, "[i]rrespective of whether it was 'blackmail,' the payment to Matloubian does not satisfy any statutory exception to the general rule against reimbursement of debts paid during marriage with community funds."

### F.    Demise of FSGM

On January 24, 2018, Gabbai told John it was time to dissolve FSGM. John so informed Andrea's counsel.

Two days later, Andrea made demands under Corporations Code section 800 that FSGM's board of directors recover all monies paid in connection with the DEA matter and all repayments made by FSGM to Oun. Andrea threatened to file a shareholder derivative suit against FSGM and a petition to have the superior court take jurisdiction over the winding up of FSGM if her demands were not met.

In February 2018, Andrea attended and was allowed to vote at a FSGM's shareholders and board of directors meeting.

---

[5] John and Andrea participated in the Internal Revenue Service's Offshore Voluntary Disclosure Program, which they completed in 2013. They also paid over $2.3 million in back taxes, penalties, and interest.

The shareholders outvoted Andrea and agreed to begin FSGM's voluntary dissolution. A certificate of Election to Wind Up and Dissolve was filed with the California Secretary of State. Andrea later failed in three attempts to have the superior court assume jurisdiction over the dissolution and winding up of FSGM.

In April 2018, Gabbai offered to acquire the parties' interest in FSGM for $6.75 million and forwarded a proposed stock purchase agreement for the acquisition. John urged Andrea to accept the offer, explaining it would likely net the parties more money than the proceeds from an auction. Andrea did not consent to the terms of the proposed sale to Gabbai. She made a counteroffer that he rejected. No further negotiations occurred between them.

An auction of FSGM's assets took place in May 2018. Andrea refused to allow John to use community funds to bid on FSGM's assets to obtain a higher price for the community. Between Gabbai and John, the winning bidder was Gabbai. He acquired FSGM's inventory for 63 percent of its cost, FSGM's intellectual property for $900,000, and FSGM's furniture, fixtures, and equipment for $350,000.

One month later, FSGM ceased operations.

### G.     Alternate Valuation Date for FSGM

The family court denied Andrea's request that FSGM be valued as of the parties' 2010 separation date rather than as near as practicable to the January 2020 trial under section 2552. Andrea argued the precipitous decline in FSGM's value over that decade was due to John's misconduct and mismanagement. The court determined, however, that "Andrea failed to establish any criminal, tortious, grossly negligent or even negligent conduct by John resulting in a decline in value of FSGM." The court found

9

FSGM's loss of value was caused by changes in the wholesale discount business and international market forces, not by John's actions.

## III. Section 271 Sanctions

### A. John's Request for Sanctions

On October 8, 2020, John requested that $2,114,229 in section 271 sanctions be imposed against Andrea for her failure to cooperate in settlement negotiations before and during trial and her overlitigation of issues relating to property.

In support of his sanctions request, John described 13 settlement offers and two requests for counteroffers that he communicated to Andrea in June 2014, following the collapse of Point Capital Partners' proposed purchase of FSGM, through trial in July 2020. Of these, Andrea failed to respond to eight offers and rejected four offers without making a counteroffer.

John also pointed to Andrea's extensive collateral litigation in state and federal court involving FSGM, which the family court found harmed the community by forcing FSGM to spend resources responding to the meritless suits rather than distributing funds to the parties.

John enumerated other pretrial activities by Andrea that were detrimental to the community, specifically, Andrea's (1) hiring of independent counsel to make false claims of John's involvement in criminal activity to federal prosecutors; (2) refusal to allow John to use community funds to bid on FSGM's assets at auction to receive a higher price, and to consider Gabbai's offer to purchase FSGM assets for $6.75 million rather than have them auctioned; (3) refusal to countersign the wire transfer instructions to timely pay discounted attorney fees; and

10

(4) insistence on retaining her own counsel for the 2801 East Vernon LLC litigation, which ultimately benefited Gabbai.

John also argued Andrea made numerous claims that she abandoned shortly before or during trial, after he had incurred legal fees to defend against them: (1) Andrea abandoned in the second month of trial her allegation that John had received perquisite income from FSGM beginning January 10, 2012; (2) Andrea abandoned two and one-half months before trial her allegation that John breached his fiduciary duty by selling one of the Vernon commercial buildings at below market price even though the sale was by a court-appointed referee to the highest bidder as the parties had agreed; (3) Andrea claimed John purchased a home on North Crescent Drive in Beverly Hills, which he failed to disclose to Andrea. After receiving evidence from John and title companies that her claim was not true, Andrea failed to confirm to John that she was withdrawing it and did not raise the claim at trial; (4) Andrea alleged John had forged her signature on various financial documents. In discovery, however, Andrea admitted almost all of her signatures were genuine. Otherwise, as the family court found, Andrea was aware of most of the transactions and had signed other related documents. Andrea never asked for reimbursement for any documents she did not sign, and the court found Andrea did not suffer any economic harm from the signatures.

John further maintained he was compelled to prepare and file requests for orders (RFO's) for which he incurred litigation costs after Andrea refused to agree to his reasonable requests. For example: (1) Following their partition action, Andrea failed to respond to John's request that each of them be allowed to use their respective share of the sale proceeds to acquire new

11

property to avoid $2.6 million in taxes. Only after John filed an RFO did Andrea stipulate to his request. (2) Andrea informed John that one of her primary attorneys would be joining a law firm started by an attorney who had previously represented John. When John refused to waive the resulting conflict of interest, Andrea insisted the attorney would continue to represent her. Only after John filed an RFO seeking the attorney's disqualification did Andrea agree to no longer retain the attorney.

### B. Andrea's Opposition to the Request

In her opposition to the request for sanctions, Andrea did not deny John's allegations. Instead, Andrea argued she should not be sanctioned for (1) rejecting John's unreasonable and one-sided settlement offers, and all of them ignored her primary "colorable claims"; (2) refusing to trust John, who "had cultivated a life of perfidy to mask decades of financial schemes." According to Andrea, "Having chosen to enter into years of illegal, convoluted financial transactions with unsavory characters, John flouted his duties of full, complete, and ongoing disclosures, forcing Andrea to investigate his multifarious schemes." Nor, Andrea argued, should she be sanctioned for advancing "colorable claims" concerning Oun's loans, Matloubian's blackmail payment, the expanded application of *Margulis*, *supra*, 198 Cal.App.4th 1252, and an alternate valuation date of FSGM, or advancing positions hinging on credibility findings of Oun's and Matloubian's testimony. Lastly, Andrea maintained the requested $2,114,229 amount would impose an unreasonable financial burden on her, contrary to section 271.

12

### C. Family Court's Ruling on the Sanctions Request

At a February 4, 2021 hearing, the parties stipulated to proceed on a written record consisting of the declarations and exhibits submitted by each party. Following argument by counsel, the matter was submitted.

On March 10, 2021, the family court partially granted John's section 271 request for sanctions and ordered Andrea to pay $700,000 rather than $2,114,229. The court calculated the $700,000 award as one-third of John's attorney fees and costs attributable to Andrea's "unreasonable and unsupported positions." The court found "this amount will not impose an unreasonable financial hardship" on Andrea. The court stayed payment until resolution of this appeal.

## DISCUSSION

Andrea contends the family court erred in imposing $700,000 in attorney fees and costs as sanctions under section 271.

## I. Applicable Law and Standard of Review

Section 271 provides: "Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys. An award of attorney's fees and costs pursuant to this section is in the nature of a sanction." (§ 271, subd. (a).)

We review an award of section 271 sanctions for an abuse of discretion. (*In re Marriage of Pearson* (2018) 21 Cal.App.5th 218, 233; *In re E.M.* (2014) 228 Cal.App.4th 828, 850.) The

13

imposition of section 271 sanctions "will be upheld on appeal unless the reviewing court, 'considering all of the evidence viewed most favorably in its support and indulging all reasonable inferences in its favor, no judge could reasonably make the order.' " (*In re E.M.*, at p. 850; *In re Marriage of Greenberg* (2011) 194 Cal.App.4th 1095, 1100 [the applicable standard of review is highly deferential].)

## II. Family Court's Ruling Imposing Section 271 Sanctions

In its four-page minute order, the family court addressed John's claims that Andrea had failed to cooperate in settlement negotiations and overlitigated issues related to property.

### A. Failure to Cooperate in Settlement Negotiations

The family court acknowledged that Andrea "should not be sanctioned simply because she did not settle the case." The court advised, however, that Andrea had an obligation to enter into settlement negotiations and could not simply ignore John's repeated offers of settlement. (*Boblitt v. Boblitt* (2010) 190 Cal.App.4th 603, 612 [" 'The duty imposed by . . . section 271 requires a party to a dissolution action to be cooperative and work toward settlement of the litigation on pain of being required to share the party's adversary's litigation costs' "]; see also *Nicholson v. Fazeli* (2003) 113 Cal.App.4th 1091, 1102 [same]; *Shenefield v. Shenefield* (2022) 75 Cal.App.5th 619, 627 [same].)

Andrea does not dispute that John made 13 settlement offers and two requests for counteroffers. And of these, Andrea failed to respond to eight offers and rejected four offers without making a counteroffer. The family court found by not responding "at all," Andrea "failed to allow [John] an opportunity to address

14

her concerns and perhaps have a meaningful and fruitful settlement discussion." The court found "[t]here is no doubt that some of [Andrea's] actions frustrated the policy of the law for settlement." Andrea's lack of cooperation in settlement negotiations both before and during trial supports the court's exercise of discretion.

## B. Overlitigation of Property Issues

The family court made findings concerning Andrea's emotionally charged and meritless litigation of property issues. The court found Andrea "allowed her distrust of [John] to drive her litigation strategy" and "cost both parties significant attorney fees." The court found Andrea adhered to positions supported by her beliefs and feelings, rather than by the facts and evidence, which "ultimately undermined her credibility." The court excerpted portions of Andrea's written opposition to section 271 sanctions to show her use of "quite aggressive language to overstate what the actual facts in the case are." As examples, the court quoted: " 'John sewed the tangled web of intrigue and dissembling that swept up Andrea and sapped away years of her life as she struggled to peel off stand (sic) after strand to reach the source' "; " 'John controlled those spheres by working surreptitiously with a cast of characters to ping-pong millions of dollars throughout the globe in a yarn of impenetrable, contradictory and untraceable transactions.' " The court found these hyperbolic allegations in Andrea's written opposition typified those made at trial and led to protracted litigation. "It is precisely [Andrea's] distrust, when viewed through the filter of overstatement and argument, that got the parties where they are in this matter. It is one thing to build a case on 'I believe' or 'I

15

think the facts will support', and altogether another thing to build a case on evidence."

The family court did not abuse its discretion in sanctioning Andrea for pursuing clearly baseless and costly litigation. Family law litigants who flout the policy of section 271 through conduct that increases litigation costs are subject to imposition of attorney fees and costs as sanctions. (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1524; accord, *In re Marriage of Greenberg, supra,* 194 Cal.App.4th at p. 1100; see *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 [§ 271 sanctions are appropriate where spouse's motions "were reckless, baseless and frivolous" and "an abuse of the legal system"]; *In re Marriage of Quay* (1993) 18 Cal.App.4th 961, 970 [§ 271 sanctions are appropriate where a spouse's "[t]aking an unreasonable position" at trial "is something more than simply taking a hard stand and aggressively litigating it"]; *In re Marriage of Burgard* (1999) 72 Cal.App.4th 74, 82 [husband's sanctionable conduct required wife to "respond to an unnecessary motion, to write a brief, to research the law on motions for reconsideration, [and] to appear at yet another hearing"]; *Burkle v. Burkle* (2006) 144 Cal.App.4th 387, 403, fn. 7 [§ 271 sanctions are appropriate where wife's filing of "a separate civil action which was bound to be dismissed and her conduct in doing so necessarily caused litigation costs to increase and therefore patently" frustrated the policy of the statute]; *In re Marriage of Norton* (1988) 206 Cal.App.3d 53, 58 [§ 271 sanctions are appropriate for frivolous or bad faith claims].)

To be sure, family law proceedings, by their very nature, lend themselves to distrust and lack of communication. (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1298.) Here,

however, the family court found Andrea's distrust of John "seeped through this entire matter and cost both parties significant attorney fees."

## III. Andrea's Contentions on Appeal from the Order

### A. No Finding John Acted in Good Faith

On appeal, Andrea first contends because section 271 requires *both* parties to have engaged in conduct that promotes settlement and reduces litigation costs, John was not entitled to sanctions unless the family court found his settlement offers were made in good faith. (See § 271, subd. (a).)

Andrea is correct the statement of decision did not include an express finding whether John made his settlement offers in good faith. Consistent with the doctrine of implied findings, however, we infer the family court found John's offers were made in good faith as supported by substantial evidence.[6] The record does not indicate Andrea either objected or otherwise apprised the court that the statement of decision failed to address the issue of John's good faith. Thus, invoking the doctrine of implied findings, we presume the court made all factual findings in support of its order, including a finding that John made good faith settlement offers. And substantial evidence supports the

---

[6] "The doctrine of implied findings provides that a 'party must state any objection to the statement in order to avoid an implied finding on appeal in favor of the prevailing party. . . . [I]f a party does not bring such deficiencies to the trial court's attention, that party waives the right to claim on appeal that the statement was deficient . . . and hence the appellate court will imply findings to support the judgment.' " (*Estate of O'Connor* (2017) 16 Cal.App.5th 159, 164; see also *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.)

17

implied finding.  In his written request for section 271 sanctions, John asserted he "made good-faith efforts to settle, which Andrea rejected."  John submitted supporting declarations from himself and his counsel, which detailed the parties' history of settlement negotiations.

## B.    Andrea Cooperated by Making Stipulations

Andrea also contends she substantially cooperated in settlement by making stipulations.  However, as John stated in his request for sanctions, the record shows a number of Andrea's stipulations were in response to his having sought or successfully obtained an RFO, or her stipulations ultimately caused John to seek an RFO, all which led to unnecessary delay and litigation expenses.  (*In re Marriage of Tharp, supra*, 188 Cal.App.4th at p. 1317 [§ 271 sanctions are appropriate "whenever a party's dilatory and uncooperative conduct" frustrates the statute's policy]; *In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1227 ["sanctions under section 271 are justified when a party has unreasonably increased the cost of litigation"].)

## C.    Andrea Should Not Be Sanctioned for Litigating Legal Positions that Are Nonfrivolous or Turn on Witness Credibility

Andrea contends, as she did before the family court, that she "was entitled to pursue reasonable extensions of the law and positions that could have been decided in her favor had the [family] court made different credibility determinations."  In addition, Andrea points to the recent decision of *Featherstone v. Martinez* (2022) 86 Cal.App.5th 775 (*Featherstone*), in which our colleagues in Division Five reversed section 271 sanctions imposed by a family court, in part because a mother in a child

18

custody dispute took litigation positions with which the court disagreed.[7]  (*Id.* at pp. 777, 785.)

We agree with Andrea's assertion that she should not be sanctioned for litigating legal positions that are nonfrivolous or turn on witness credibility.[8]  But that is not what happened here. In its statement of decision, the family court expressly agreed with Andrea's contention in her opposition that she should not be sanctioned for seeking to expand the law of *Margulis, supra,* 198 Cal.App.4th 1252.  The court then explained that, based on its factual findings, John would have prevailed even if he had been charged with carrying the burden of proof as urged by Andrea.

The family court also agreed with Andrea's assertion that many of her trial positions hinged on a credibility finding—one of which, the court noted, was Andrea's position that Matloubian's payment constituted "blackmail."  This was an issue "that depended on credibility, and presumably could have gone either way."  The court also found, however, that "many" of Andrea's positions "were simply not supported regardless of witness credibility."

In *Featherstone*, the family court's grounds for imposing $10,000 sanctions included:  (1) The mother's early declarations in the case; (2) the mother's Code of Civil Procedure section 170.1

---

[7] We denied Andrea's request to file supplemental briefing on this decision.

[8] We find it troubling that in asking us to infer, rather than claiming outright, the family court sanctioned her for pursuing reasonable extensions of the law and positions turning on credibility, Andrea parses the statement of decision to misleadingly suggest ambiguities and contradictions where none exists.

motion to disqualify the judge for bias; (3) the mother's proposed judgment; and (4) the mother's request that the father's video calls with their child "take place on Zoom only." (*Featherstone, supra,* 86 Cal.App.5th at p. 784.)

In concluding the family court's imposition of section 271 sanctions was an abuse of discretion, the Court of Appeal explained: "Threaded throughout the court's recitation were (1) the court's characterizations of Mother's requests as 'entitled,' 'controlling,' and 'overreaching,' and (2) its own umbrage at being accused of bias and being the subject of a disqualification motion. Individually or collectively, this is not litigation behavior that a judge, staying within the bounds of reason, could conclude merited sanctions at all—much less a $20,000 sanctions award (if we count the improper amount assessed against counsel too)." (*Featherstone, supra,* 86 Cal.App.5th at pp. 784–785.)

The Court of Appeal also faulted the family court for using its characterization of the mother's "controlling 'mindset' " and her requests in her declarations for Zoom video calls to justify sanctions. This was improper because the court "was principally sanctioning Mother not for taking actions that frustrated settlement efforts but for taking litigation positions with which the court disagreed." (*Featherstone, supra,* 86 Cal.App.5th at p. 785.) The Court of Appeal also concluded the errors in the mother's proposed judgment were not significant to warrant sanctions and the family court itself had previously encouraged the parties to video-record each other. (*Id.* at p. 785 & fn. 7.)

We discern no similarities between the instant case and *Featherstone.* The record before us contains no hint of judicial bias, and nothing in the statement of decision suggests the family court imposed section 271 sanctions because it disagreed with

Andrea's litigation positions.  Rather, as discussed, Andrea was sanctioned for conduct that discouraged settlement, needlessly lengthened court proceedings, and increased litigation costs.

### D. Family Court Erred by Imposing Sanctions Without Evidence of John's Income, Assets, and Liabilities

Andrea contends the family court abused its discretion by imposing sanctions without having John submit an updated income and expense declaration or similar financial information, thereby contravening section 271's directive that "the court shall take into consideration all evidence concerning the parties' incomes, assets, and liabilities."[9]  (§ 271, subd. (a).)  This is an issue of first impression.

Andrea's contention rests on two grounds:  (1) Section 271 requires such evidence; and (2) if a court obtains current financial information from both parties, it can "scale" a sanctions award to their comparative wealth so as not to discourage an economically weaker party, like Andrea, from vigorously pursuing future litigation, citing *In re Marriage of Norton, supra,* 206 Cal.App.3d at p. 60.)

---

[9] This issue arose during the section 271 sanctions hearing when Andrea's counsel argued John had to file a current income and expense declaration before the family court could award him sanctions.  John's counsel opposed the request, arguing it was contrary to the existing state of the law, but offered to provide the court with John's current financial condition.  The court answered that was unnecessary and took the matter of sanctions under submission.

Our interpretation of the language of section 271 "is an issue of law, which we review de novo." (*United Riggers & Erectors v. Coast Iron & Steel Co.* (2018) 4 Cal.5th 1082, 1089.)

"The fundamental task of statutory construction is to ascertain legislative intent so as to effectuate the purpose of the law." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 611.) In doing so, a court should look to the plain meaning of the statutory language. (*Ibid.*) Where the intent is clear from the language itself, the court will not look beyond the plain meaning. (*Stephens v. County of Tulare* (2006) 38 Cal.4th 793, 802.) In other words, when the words are unambiguous, a court presumes the legislators meant what they said.

Further, a court may not, " 'under the guise of statutory construction, "rewrite the law or give the words an effect different from the plain and direct import of the terms used." ' " (*California Correctional Peace Officers Assn. v. State of California* (2010) 189 Cal.App.4th 849, 858.) Nor may a court add to or alter the statute's words " ' "to accomplish a purpose that does not appear on the face of the statute or from its legislative history." ' " (*In re Marriage of Siller* (1986) 187 Cal.App.3d 36, 43.) This would violate " 'the cardinal rule of statutory construction that courts must not add provisions to statutes. [Citations.] This rule has been codified in California as [Code of Civil Procedure] section 1858, which provides that a court must not "insert what has been omitted" from a statute.' " (*People v. Guzman* (2005) 35 Cal.4th 577, 587.) Further, a court shall "give effect to all words and provisions of a statute and leave no part superfluous or inoperative." (*Leavitt v. County of Madera* (2004) 123 Cal.App.4th 1502, 1519.)

22

Turning to the relevant language of the statute, section 271, subdivision (a) states: "In making an award pursuant to this section, the court shall take into consideration all evidence concerning the parties' incomes, assets, and liabilities. The court shall not impose a sanction pursuant to this section that imposes an unreasonable financial burden on the party against whom the sanction is imposed. In order to obtain an award under this section, the party requesting an award of attorney's fees and costs is *not* required to demonstrate any financial need for the award." (Italics added.)

In interpreting section 271, we apply the rules of statutory construction and "give effect to all words and provisions" without "insert[ing] what has been omitted." The plain meaning of section 271, subdivision (a) is clear; it is unambiguous. It directs the family court to consider "all evidence concerning the parties' incomes, assets, and liabilities." But the statute also expressly omits the usual requirement that a party requesting an award of attorney fees and costs must establish a financial need for the award or financial disparity between the parties. (Compare §§ 2030, 2032, 3557, 7605.) Certainly, the family court has discretion to ask or order the requesting party to provide financial information, in the belief such information would be helpful or relevant. The requesting party may also seek to provide financial information, as John did, or simply file an income and expense declaration to avoid the risk of an adverse ruling.

Thus, contrary to Andrea's contention, we do not interpret section 271 as requiring the requesting party to provide a current income and expense declaration or similar financial information. The requesting party may be asked by the family court or may

23

choose to submit the evidence for the court's consideration. But there is no statutory obligation for the requesting party to do so before the court can consider ordering sanctions.

While section 271 is not need-based, we do agree with Andrea that in certain instances, by comparing the parties' relative wealth, a family court avoids discouraging the less affluent party from vigorously litigating claims and defenses for fear of incurring excessive sanctions. (*In re Marriage of Norton, supra*, 206 Cal.App.3d at p. 59.) This is not one of those instances. The record fails to show Andrea is significantly less affluent than John. Indeed, Andrea does not argue the court was unfamiliar with her financial condition or that payment of a $700,000 sanction will cause her unreasonable financial hardship.

The family court did not abuse its discretion in sanctioning Andrea in the amount of $700,000.

## IV.    Appeal from the Judgment Is Deemed Abandoned

" 'An appealed-from judgment or order is presumed correct. [Citation.] Hence, the appellant must make a challenge. In so doing, he must raise claims of reversible error or other defect [citation], and "present argument and authority on each point made [citations]. If he does not, he may, in the court's discretion, be deemed to have abandoned his appeal. [Citation.] In that event, it may order dismissal.' " (*Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 544, fn. 8; see also *Berger v. Godden* (1985) 163 Cal.App.3d 1113, 1119 ["failure of an appellant in a civil action to articulate any pertinent or intelligible legal argument in an opening brief may, in the discretion of the court, be deemed an abandonment of the appeal justifying dismissal"]; *Bauer v. Merigan* (1962) 206 Cal.App.2d 769, 771 [contemplated appeal

24

may be deemed abandoned if not pursued].)  Because Andrea's appellate briefs lack any argument that the family court erred in rendering its judgment, we exercise our discretion to dismiss her appeal from the judgment as abandoned.

## DISPOSITION

The order entered pursuant to Family Code section 271 is affirmed.  The appeal from the judgment is dismissed. Respondent John Pourmoradi is awarded his costs on appeal.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



ASHMANN-GERST, J.



CHAVEZ, J.